LAKE SUPERIOR SHIP CANAL RAILROAD & IRON CO. (SUTHERLAND v.). See Case No. 13,643.

## Case No. 7,999.

LAKIN v. FIRST NAT. BANK OF JAMESTOWN.

[13 Blatchf. 83.] [1]

District Court, N. D. New York. July 1, 1875.

BANKRUPTCY—FRAUDULENT ASSIGNMENT—EVIDENCE.

1. In a suit in equity, brought by an assignee in bankruptcy, to recover certain notes alleged to have been transferred in violation of the bankruptcy act [of 1867 (14 Stat. 517)]. the bill alleged the filing of a voluntary petition by the bankrupt. the appointment of the assignee. and the assignment to him. These allegations were admitted by the answer: *Held*, that it was not necessary the bill should allege directly that there had been an adjudication of bankruptcy.

2. Circumstances discussed. on the question as to whether the officers of a bank had reasonable cause to believe that the bankrupt was insolvent. or that the transaction between the bank and the bankrupt was in fraud of the bankruptcy act.

3. What would be evidence of insolvency or of fraud in a strictly commercial community. may have less significance in a rural district. Bill dismissed. without costs.

In equity. This suit was brought [by Henry O. Lakin] to recover certain notes in the hands of the defendants, claimed to have been taken and to be held in violation of

[1] [Reported by Hon. Samuel Blatchford. District Judge, and here reprinted by permission.]

the provisions of the bankruptcy act. It was heard on pleadings and proofs.

A. P. Laning, for plaintiff.

George Gorham, for defendants.

HUNT, Circuit Justice. The defendants object to the right of recovery in this case, on the ground that the complainant has not averred or proved that Harrington, Wilcox & Co. were ever adjudged to be bankrupts, contending that he cannot bring the action, as their assignee, before such adjudication. The bill alleges, that, on the 28th day of August, 1867, this firm of traders presented their petition to the district court, praying that they might be adjudged bankrupts within the provisions of the act on that subject, and be discharged from their debts; that such proceedings were had, that the complainant was duly appointed the assignee of all the estate of said firm, under the provisions of the said act; and that, on the 15th day of January, 1868, Charles P. Vedder, a duly appointed register in bankruptcy, to whom the matter was referred by the court, did convey to the complainant all the estate of the bankrupts, referring to such instrument of assignment. All these allegations are admitted in terms in the answer, and it is admitted "that the complainant was duly appointed assignee in such matter, pursuant to the act of congress," and that Vedder, the register, made the assignment as is set forth in the bill. These allegations and admissions seem to be quite sufficient for the purpose mentioned. Passing by the question of the effect to be given to the word "duly," it is admitted in the pleadings that the petition was presented, that it was referred to the proper register, that by such register the complainant was appointed assignee, and that a conveyance was made to him accordingly.

The statute declares (section 11) that, when proceedings of this nature are taken, the filing of such petition shall be an act of bankruptcy, and such petitioner shall be adjudged a bankrupt. The further proceedings depend upon the fact of opposition or no opposition. If the latter, the register shall direct notices to be published, and procure a meeting of creditors, who shall choose an assignee; or the register, upon their failure to make such choice, shall appoint an assignee. If there be opposing interests, the appointment shall be made by the judge. To this assignee a conveyance is directed to be made by the register, if there is no opposition—by the judge, if there is—which passes to him all the bankrupt's estate.

I see nothing in this statute which requires the adjudication of bankruptcy to be set out in the bill. In the first place, the adjudication is a legal result, occurring of itself, and necessarily, upon the facts stated. The presentation of a petition, the appointment of an assignee, and the conveyance to

him by the register, necessarily assume that there has been an adjudication. Without it, there could be no such proceedings.

Again, there is no principle of good pleading which requires an assignee or trustee to state in his bill the details of the facts by which he becomes entitled to maintain a suit. He alleges, that, upon the facts averred, a cause of action under the statute of bankruptcy has accrued to the assignee of Harrington, Wilcox & Co., that he is such assignee, appointed by the proper officer, the register, and that he has received a conveyance from him, and he prays judgment. This is good pleading. The rest is matter of evidence.

Again, when it is expressly admitted that the complainant is the assignee under the bankrupt act, that is all there is to be said about it. I do not think it necessary, therefore, to decide whether the order adjudicating bankruptcy, produced upon the argument, can be considered. The insolvency of Harrington, Wilcox & Co., at the time of the transfer of the notes, is fully proved, and is not disputed; but it is said that there is not sufficient evidence that the defendants knew, or had reasonable cause to believe, that this evidence existed, or that they knew that the transfer was made in fraud of the act. The firm of Harrington, Wilcox & Co., began its operations on the 27th of June, 1866. It closed by the sale to Carpenter, on the 13th of June, 1867. It sold to Carpenter, in bulk, at a discount of twenty-five per cent. on New York prices, payable in monthly instalments of $400 each, without interest, taking thirty-three notes of $400 each, for the amount, extending over thirty-three months. The loss of interest, by this credit, made an additional discount of eight or ten per cent. on the sale. The proceeds of this sale, $13,200 in form, and about $1,000 in good accounts, constituted the assets of the firm. Its indebtedness amounted to $24,000, of which one-half was payable to merchants in New York, the other half to Andrews & Preston and the First and Second National Banks of Jamestown. This insolvency Wilcox testifies that he was aware of, when he delivered the thirteen notes to Kent, the president of the First National Bank. It is testified to, by Mr. Abbott, and is pretty much admitted by the evidence of the bank officers, that a note of Harrington, Wilcox & Co., of $500, to Abbott's firm, due in May or June, was sent to the bank for collection, was unpaid at maturity, and had so remained for about thirty days, at the time the notes were received. It appears, also, that Harrington, Wilcox & Co. owed the bank about $5,000, for which they had no security, except the notes of the firm at various dates, and running from sixty to ninety days; and that they agreed with the firm, that, if they sold out to Carpenter, they would take the notes to be received from him, in exchange for the notes of the firm

then held. It is quite extraordinary, that a bank, for no other reason than that the party should continue to do business with it, (which is the reason given by the cashier), should give up good notes at short dates, and receive for them notes payable at one and two years and intermediate times. The less of that business a bank should do, the better it would be, one would suppose, and some other reason must be sought for such an exchange. It is an unusual circumstance also, that these notes should have been taken by the president at the store of Harrington, Wilcox & Co.; and not at the bank, and that he should have been advised by the cashier to go to the store to get them. In well conducted institutions, the business of the bank is done at the banking house. Presidents and cashiers do not run around the city or village to get the notes of their dealers, and receive them at the stores of their solvent debtors. If debtors are embarrassed, and the security is doubtful, the officers or their attorneys do make such visits, but we should not look for it in the case of customers of a bank, whose credit was undoubted. These are suspicious circumstances, and tend strongly to fix upon the bank a knowledge of the insolvency of Harrington, Wilcox & Co., when they took the notes in suit.

On the other hand, it is to be considered, that, in a small place like Jamestown, commercial punctuality is not as highly prized as in the larger cities. It is testified in this case, and it is true generally, that, in such places, men who are perfectly able to pay their notes, do allow them to go to protest, and to lie under protest till it is convenient to pay them. Country debtors act upon the theory that any inconvenience arising from the non-payment of a note at its maturity had better be borne by the creditor than by the debtor. What would be evidence of insolvency or of fraud in a strictly commercial community may have less significance in a rural district. The president, Mr. Kent, and the cashier, Mr. Mayhew, both certify, not only that the credit of this firm was not affected by the non-payment of their notes in May, 1867, but that they had entire confidence in their solvency when they took these notes, and that they took them without suspicion. The senior Wilcox had, within the year, desired Mr. Kent to receive the name of the firm for whatever was wanted by them, and stated that he was worth $25,000, clear of all incumbrances, consisting of real estate, bonds and mortgages, and government bonds. This statement Mr. Kent says that he relied upon. Mr. Wilcox, one of the partners, testifies, that, until he took an inventory, to complete the sale to Carpenter, he supposed the firm to be solvent, and that he was greatly surprised at the result of the inventory. This was a few days before the notes were delivered to the bank. On the 19th of May, the bank renewed a note of the

firm for $1,000, endorsed by Andrews & Preston, who were good, by taking in its place the note of the firm, endorsed only by S. S. Wilcox, one of the firm. That the reputation of the firm was very good, and that their failure created much surprise, appears, also, by the evidence of the witnesses called by the complainant.

Although the matter is not free from doubt, I am not able to find that the defendants had good reason to believe the firm to be insolvent when they received the notes, or that they knew that they were transferred in fraud of the provisions of the bankrupt act. The bill is dismissed, but without costs to either party.